691 A.2d 1281

MONTGOMERY COUNTY, Maryland

v.

Keith A. BRADFORD et al.

MONTGOMERY COUNTY, Maryland

v.

BOARD OF SCHOOL COMMISSIONERS
OF BALTIMORE CITY et al.

Nos. 31 and 56, Sept. Term, 1996.

Court of Appeals of Maryland.

April 4, 1997.

Roger W. Titus (Kevin B. Collins, Venable, Baetjer and Howard, LLP; Charles W. Thompson, Jr., County Attorney; Marc P. Hansen, Senior Assistant County Attorney, on brief), Rockville, for Petitioner.

Lawrence Fletcher-Hill, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General; Evelyn O. Cannon, Margaret Ann Nolan, Assistant Attorneys General, on brief), Baltimore, Laura S. Shores (Helen Michael, William L. Webber, Howrey & Simon, on brief), Washington, DC, for Respondents.

Edward C. Schweitzer, Jr., Washington, DC.

Abbey G. Hairston, Koteles Alexander, Alexander, Bearden, Hairston & Marks, LLP, on brief, Silver Spring; John M. Bryson, II, Edward C. Schweitzer, Jr., Shaw, Pittman, Potts & Trowbridge, on brief, Washington, DC.

Louis M. Bograd, ACLU, Washington, DC, Susan Goering, Malissa Ruffner, ACLU, Baltimore, for Keith A. Bradford et al.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI and RAKER, JJ., and ROBERT C. MURPHY, Judge (retired), Specially Assigned.

ROBERT C. MURPHY, Judge, Retired, Specially Assigned.

I

We consider in these consolidated cases whether the Court of Special Appeals erred in affirming judgments of the Circuit Court for Baltimore City which denied motions filed by Montgomery County to intervene (1) in a class action suit filed on behalf of present and future students of the Baltimore City Public School System by attorneys for the American Civil

Liberties Union (ACLU), Keith and Stephanie Bradford, and a number of other individuals (collectively the Bradford plaintiffs or the Bradford case); named as defendants were the State Board of Education and several State officials; and (2) a declaratory judgment action filed by the Board of School Commissioners of Baltimore City against the State Board of Education (the City case). The main thrust of each action was to obtain a declaratory decree that the Baltimore City public school students were deprived of their rights to at least the minimum quality of education mandated by Article VIII, § 1 of the Maryland Constitution which provides:

> The General Assembly, at its First Session after the adoption of this Constitution, shall by Law establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance.

## A

The Bradford complaint alleged that the State was responsible for a number of educational deficiencies in the Baltimore public school system due to various economic, social, and educational factors peculiar to Baltimore City, as a result of which the public school students in the City will be unable to obtain an adequate education as guaranteed by the Maryland Constitution. In this regard, the complaint referred to the high incidence of Baltimore City public school students who live in poverty, many of whom live in households with fewer than two parents; that many of the students' parents are not high school graduates and they are unemployed, and are homeless or pregnant; live under the threat of violence; have been held back in school; score more than one year below grade level on standardized testing measures; or have otherwise been determined to be in need of remedial education.

According to the allegations of the complaint, these children are most susceptible to the harmful effects of an inadequate education and are thus "at-risk" students. The complaint emphasized the lack of adequate education that these students

are receiving by citing unsatisfactory compliance with State Board of Education standards as codified in the Code of Maryland Regulations (COMAR), Title 13A. In particular, the complaint focuses attention on the poor performance of these students on State outcome tests, low student attendance resulting from an inordinately excessive absenteeism, and extremely high dropout rates (six times higher than the State Board's "satisfactory standard"). The complaint also referred to a lack of preparation for higher education (only 30% of the students who graduate from Baltimore City high schools had completed minimum course requirements that would qualify them for admission to the University of Maryland system). It also referred to inadequate educational resources far short of the standard for an adequate education and to a far greater extent than any other school district in Maryland.

As to these allegations of inadequate educational resources, the complaint referred to "standards" promulgated by the State Board of Education relative to the resources that a school district should provide to students to satisfy the requirement of receiving a constitutionally adequate education. Specifically, the complaint averred that Baltimore City public schools had one of the highest student-to-teacher ratios in Maryland and that fewer than 1% of the Baltimore City public schools had the required number of libraries staffed to adequately serve the students.

In its prayers for relief, the complaint disavowed seeking to reduce or reallocate educational resources currently provided to any other school district in Maryland; rather it sought to secure access to an adequate education for the children attending the public schools in Baltimore City. The complaint sought a declaration that the State had failed to fulfill its constitutional obligation to provide a system of public schools adequate to meet the needs of school children in Baltimore City public schools. The Bradford plaintiffs sought a court order requiring the State to work with the plaintiffs and Baltimore City to improve the City's public schools so that they provide an adequate education in conformance with contemporary educational standards; and to further order the

State to take all steps necessary to implement an educational improvement plan which would result in providing an adequate education to the public school children in Baltimore City.

On January 25, 1995, Montgomery County, Maryland, pursuant to Maryland Rule 2–214, moved to intervene in the class action suit either as a matter of right or permissively. That rule provides as follows:

(a) **Of Right.**—Upon timely motion, a person shall be permitted to intervene in an action: (1) when the person has an unconditional right to intervene as a matter of law; or (2) when the person claims an interest relating to the property or transaction that is the subject of the action, and the person is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest unless it is adequately represented by existing parties.

(b) **Permissive.** -

(1) *Generally.*—Upon timely motion a person may be permitted to intervene in an action when the person's claim or defense has a question of law or fact in common with the action.

In its motion, Montgomery County acknowledged that the Bradford complaint did not directly attack the constitutionality of the system of public school funding which we upheld in *Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 458 A.2d 758 (1983). That case involved a challenge by several fiscally distressed school districts, including Baltimore City, to the constitutionality of Maryland statutes under both the Maryland Constitution (Article VIII, § 1) and the equal protection clause of the United States Constitution with respect to the system of financing public elementary and secondary schools in Maryland's twenty-four school districts. We there noted that the Maryland public school system is primarily financed by a combination of State and local tax revenues under a per pupil equalization formula whereby the State, in its distribution of financial aid to local public school systems, provides

greater amounts to jurisdictions having more limited local resources than to those having greater local resources. *Hornbeck* thus focused in particular upon the existence of wide disparities in taxable wealth among the various school districts, and the effect of those differences upon the fiscal capacity of the poorer districts to provide their students with educational offerings and resources comparable to those of the more affluent school districts. While *Hornbeck* teaches that the Maryland constitutional provision does not mandate uniformity in per pupil funding or require that the system operate uniformly in every school district, it does require that the General Assembly establish a Statewide system to provide an adequate public school education to the children in every school district. As *Hornbeck* recognizes, 295 Md. at 639, 458 A.2d 758, Maryland has established "comprehensive Statewide qualitative standards governing all facets of the educational process in the State's public elementary and secondary schools." Where, however, these standards "failed to make provision for an adequate education," or the State's school financing system "did not provide all school districts with the means essential to provide the basic education contemplated by § 1 of Article VIII, when measured by contemporary educational standards, a constitutional violation may be evident. But "[s]imply to show that the educational resources available in the poorer school districts are inferior to those in the rich districts does not mean that there is insufficient funding provided by the State's financing system for all students to obtain an adequate education." *Hornbeck*, 295 Md. at 639, 458 A.2d 758.

Montgomery County's motion to intervene in the Bradford case asserted that if there were to be a finding of a violation of Article VIII, § 1 of the Maryland Constitution, the plaintiffs would view the remedy "as being a vast increase in the commitment of State financial resources to the Baltimore City Public School System, a commitment which already is in excess of that which is made by the State to most other school systems in the State, including that in Montgomery County." The County further stated in its motion to intervene that "the

diversion of still additional State resources to Baltimore City would cause a diminution in the resources available to other jurisdictions in the State, including Montgomery County, in the absence of an increase in State taxes which, at the present time, appears unlikely." Continuing, Montgomery County's motion to intervene stated that if the plaintiffs were to prevail, Montgomery County, which is responsible for the local funding of its public schools, would be called upon to devote still more revenues from local tax sources for support of its public school system. As a result, Montgomery County urged that it has a "strong interest" in the subject of the suit and is so situated "that disposition of the action may, as a practical matter, impair or impede its ability to protect that interest unless it is allowed to participate as a party, since it is not adequately represented by existing parties" in the sense contemplated by Maryland Rule 2–214(a)(2). In this regard, Montgomery County alleged that it has a fundamental interest in participating in defining the parameters and components of a constitutionally adequate education in Maryland school districts in a manner that does not adversely affect Montgomery County or its public school system. The case raised other issues which, according to Montgomery County, if decided adversely to it could profoundly affect its own public school system which is largely funded by the County.

The County relied primarily on the provisions of Rule 2–214 and this Court's decision in *Citizens Coordinating Comm. v. TKU,* 276 Md. 705, 351 A.2d 133 (1976), a case in which we concluded that under Maryland Rule 208, the predecessor to Rule 2–214, intervention as a matter of right should have been granted.

On February 13, 1995, the Bradford plaintiffs opposed the County's motion to intervene, stating that the fundamental prerequisite to intervention of right under Rule 2–214 was not satisfied, namely "a direct, substantial, legally protectable interest in the subject matter of the action," i.e., whether the public schoolchildren of Baltimore City are receiving the "thorough and efficient" education guaranteed by the Maryland Constitution. As to this, the plaintiffs asserted that

Montgomery County impermissibly seeks to intervene by connecting the subject matter of this action with a speculative impact on the County's local tax burden ... by a leap of faith, not by principles of law." In arguing that Montgomery County does not qualify for intervention as of right under Rule 2–214(a)(2), they relied primarily on *Shenk v. MD. District Savings & Loan,* 235 Md. 326, 201 A.2d 498 (1964) and *Hartford Ins. Co. v. Birdsong,* 69 Md.App. 615, 519 A.2d 219 (1987) for the proposition that the interest asserted by the would-be intervenor may be neither speculative nor contingent.

The defendant State Board of Education also opposed the County's motion on the ground that the primary issue presented concerns the adequacy of the education of the children of Baltimore City. It says that Montgomery County has no constitutional or statutory obligation with respect to the quality of education that the children of Baltimore City receive and, therefore, have no legal interest in whether that education is constitutionally adequate. Moreover, it posits that Montgomery County's allegations present "an extremely narrow and hypothetical interest in this case: i.e., money," which is not the primary subject of the litigation. According to the State Board's motion:

> [T]he primary subject [of the suit] is the adequacy of the education received by the children of Baltimore City, and Montgomery County cannot, and does not, claim any legal interest relating to that subject. Further with respect to money, Montgomery County is not 'so situated that the disposition of the action may as a practical matter impair or impede the ability to protect' its interests.

Montgomery County, by a further memorandum filed on March 29, 1995, undertook to counter the allegations in opposition to its motion to intervene. In support of its position, it placed reliance on the *TKU* case, *supra,* 276 Md. 705, 351 A.2d 133, which it says holds that the intervention rule "merely requires the applicant for intervention [as of right] to show that it *might* be disadvantaged by the disposition of the action in which it seeks to intervene and that it have an interest for

the protection of which intervention is essential and not otherwise protected." (Emphasis in original)

On April 11, 1995, the Circuit Court for Baltimore City (Kaplan, J.) denied Montgomery County's motion to intervene both as of right or on a permissive basis. It said that the sole controversy was whether the children in Baltimore City "were obtaining an adequate education within the meaning of the Maryland Constitution, Article VIII, § 1. As to this, the trial court said:

> Whether the children in Montgomery County are getting an appropriate education is not involved in this lawsuit. The only thing that [Montgomery County] ... could be in here for is some prospective loss of funds because there's only so much in the State pot and if Baltimore City gets more of that State pot, then Montgomery County will get less and so will Kent County and so will Garrett County and so will all of the rest of the twenty three other jurisdictions than Baltimore City.
>
> ... I don't see that as an interest in this particular litigation. It's some speculative thing that may never occur way down the line.

It said that there are four separate prongs to Rule 2–214: "(1) the application for intervention must be timely; (2) the applicant must have an interest in the subject matter of the action; (3) disposition of the action would at least potentially impair the applicant's ability to protect its interest; and (4) the applicant's interest must be inadequately represented by existing parties," citing *Hartford Ins. Co. v. Birdsong, supra,* 69 Md.App. at 622, 519 A.2d 219. It said that failure to satisfy any prong warrants denial of a motion to intervene as of right. It said that Montgomery County failed to satisfy the second prong of the test. Montgomery County appealed to the Court of Special Appeals from the trial court's denial of its motion to

intervene in the Bradford case.[1]

## B

On September 15, 1995, prior to the decision of the Court of Special Appeals on Montgomery County's motion to intervene, a second complaint for declaratory judgment was filed in the Circuit Court for Baltimore City (the City case). It was filed by the Board of School Commissioners of Baltimore City against the State Board of Education, and the State Superintendent of Schools, alleging, as in the Bradford case, that students in the Baltimore City public schools (not limited to "at-risk" students) were being deprived of their right to an adequate education in violation of the Maryland Constitution, Article VIII, § 1, and sought by way of relief that the State provide a constitutionally adequate education to these students.[2] Montgomery County moved to intervene in this case on the same grounds as it set forth in the Bradford case.

## C

On October 20, 1995, a Third Party Complaint was filed in the Bradford case by the State Board of Education, members of the Board in their official capacities, and the State Superintendent of Schools against the Board of School Commissioners of Baltimore City and the Superintendent of Public Instruction of Baltimore City. This complaint alleged that the public schools of Baltimore City were grossly mismanaged in that, among other things, the defendants refused to implement the recommendations of various study groups, failed to access and expend funds available to it, and refused to avail itself of fiscal and technical assistance offered by the State to meet State standards and rectify other deficiencies. The Third Party Complaint sought an order directing the City school manage-

---

1. That denial of a motion to intervene is an appealable final order is well settled. See e.g. *Citizens Coordinating Comm. v. TKU,* 276 Md. 705, 709–710, 351 A.2d 133 (1976).

2. The complaint in the City case was amended on January 31, 1996, mostly without substantive change.

ment to substantially restructure the Baltimore City Public School System to correct the claimed deficiencies.

## D

On February 14, 1996, the Court of Special Appeals, in an unreported opinion, affirmed the judgment of the Circuit Court for Baltimore City denying the County's motion to intervene in the Bradford case. In doing so, it rejected Montgomery County's argument that to intervene as a matter of right under Rule 2–214(a), it simply needed to show an interest relating to the property or transaction that is the subject of the action and aver that, absent intervention, it "may be disadvantaged" in that the disposition of the action may, as a practical matter, impair its ability to protect its interest. The court said that the "may be disadvantaged" prong was "just one aspect to the rule governing intervening as a matter of right." To otherwise conclude, the court said, would be "an extremely myopic reading of the rule and relevant case law." Noting that the cases relied upon by Montgomery County—*TKU* and *Board of Trustees v. Mayor and City Council of Baltimore*, 317 Md. 72, 562 A.2d 720 (1989)—did not support the County's position, it stated that the mere finding that a party "may be disadvantaged" does not automatically give rise to a right to intervene.

In making the determination whether the trial court properly concluded that Montgomery County has no legal interest in the subject matter of the present case, the intermediate appellate court looked to its decision in *Birdsong, supra,* where it said that "in order to be a ground for intervention, the interest asserted must be one which it is *essential to protect and which is not otherwise protected*"; and thus, the interest asserted could not be "merely speculative [but] rather it must be a 'direct, significant legally protectable interest' to support the claim of intervention as of right." 69 Md.App. at 626–628, 519 A.2d 219. (Emphasis added.)

The court rejected the contention that because Montgomery County also has children "at-risk" it must be allowed to

participate in a trial that determines the level of education that should be supplied to an "at-risk" child. It reasoned that if Montgomery County is concerned with its "at-risk" children and believes that the State is not supplying them with a constitutionally guaranteed adequate education, it can bring its own suit against the State. In this regard, it recognized that the Bradford complaint is extremely fact-specific and focuses solely on the children in the Baltimore City public school system.

Responsive to another Montgomery County contention, the court said that the resolution of this case will not necessarily establish a mandated level of education that must be supplied to children throughout the State, as that is a matter for the legislature which must give content to the term "adequate." Because of this, the court concluded that the simple contention that the County has "at-risk" children does not reach the necessary threshold level to permit it to intervene as a matter of right.

Nor did the court find any merit in the County's contention that it is entitled to intervene as a matter of right where the relief requested, if granted, is likely to require increased Montgomery County resources and taxes. It said that the Bradford plaintiffs are not seeking a redistribution of State assets as was true in *Hornbeck v. Somerset Co. Bd. of Educ., supra,* nor is it asking for a restructuring of its finance system as the plaintiffs in *Hornbeck* were asserting. None of the Montgomery County prayers for relief, the court said, rose to the level required to satisfy the County's request for intervention as of right. The court explained that it was pure speculation that should the relief requested be given, it would place any burden on Montgomery County, noting that suppositions and innuendo do not form a basis to support a party seeking to intervene in a case as a matter of right.

The court found no merit in the County's further assertion that it was entitled to intervention as of right because of its interest in protecting State and local shared responsibility for funding and managing public education in the State. As to

this, the court said that there are no allegations in the complaint that challenged the statewide system of local control. It simply alleges that the children in the Baltimore City public schools are not afforded their right to a constitutionally guaranteed adequate education. Continuing the court said that a resolution of that issue will not result in an overhaul of the entire State system of local management. By way of further explanation, the court said that the only system that could possibly be affected and is in danger of losing management control is Baltimore City. The court continued by stating that because Montgomery County has no significant legal interest in whether the children of Baltimore City are receiving an adequate education, Montgomery County's motion to intervene as a matter of right was properly denied in the Bradford case.[3]

## E

After Montgomery County's motion to intervene in the City case was denied for the same reasons as in the Bradford case, we were presented with two questions for appellate review common to both the Bradford and City cases, namely:

1. Whether the "essentiality of interest" test for intervening as of right adopted by the Court of Special Appeals in *Birdsong* should be overruled or its application to the case be reversed on the basis that it is inconsistent with this Court's ruling in the *TKU* case.

2. Whether Montgomery County should have been permitted to intervene in both cases where the relief requested, if granted, would result in substantial additional financial burdens on the County in the funding of its local education system and the possible elimination of shared State and local responsibility for public education in Maryland.

---

**3.** The court considered but denied Montgomery County's request to intervene on a permissive basis under Rule 2–214(b).

F

Subsequently, on October 18, 1996, prior to oral argument of the cases before us, the Circuit Court for Baltimore City granted the motion of the Bradford plaintiffs for partial summary judgment, concluding that the Maryland Constitution, Article VIII, § 1, requires the State to provide a thorough and efficient system of free public schools in order that all students in Maryland public schools be provided with a constitutionally adequate education. In its order, the circuit court said that "based on the evidence submitted by the parties, there was no genuine material factual dispute that the public schoolchildren in Baltimore City were not being provided with an education that is adequate when measured by contemporary educational standards. The court stated in its order, however, that there is "a genuine dispute regarding the cause of the inadequate education provided to students in Baltimore City public schools and the liability therefor."

G

On November 12, 1996, in a "Joint News Release," the parties announced that they had reached a written agreement to settle the cases without trial. The Release stated that the agreement included a commitment to provide "substantial additional State funding in the amount of $254,000,000 over a five-year period for the City public schools through the year 2002, the funding being combined with management and additional reforms [to include] a consent decree" entered by the Circuit Court for Baltimore City by agreement of the parties, all for the purpose of improving student achievement. First year State funding required a $30,000,000 State appropriation in fiscal 1998, $50,000,000 in each of fiscal years 1999 and 2000, and at least $50,000,000 each in years 2001 and 2002, as well as $24,000,000 for school construction. The agreement called for a "New," Board of School Commissioners of Baltimore City, selected jointly by the Mayor and the Governor from a list of names proposed by the State Board of Education. The new School Commissioners would select a Chief Executive Officer

for the City schools who would select a management team, including a Chief Academic Officer and a Chief Fiscal Officer. The new Board, under the agreement, would be required to forge a master plan for improvement of the City schools, to include protecting the rights of City schoolchildren receiving special education under federal court orders by integrating the special education service into the new management structure of the City school system.[4] The Release characterized the parties' agreement as a "partnership" between the State and the City to create new management with increased resources. The agreement noted the entry of the partial summary judgment in the Bradford case based on the violation of the Maryland Constitution, Article VIII, § 1 as to the Baltimore City public schools. At the same time, it pointed out that the cause for the failure of the City Public School System to provide the required constitutionally adequate education remained undetermined.

Consistent with the Joint News Release, a twenty-five-page Consent Decree was entered by the Circuit Court for Baltimore City on November 26, 1996, signed by each of the parties in the Bradford and City cases. It noted the parties' agreement that $254,000,000 of State funds "shall be provided" to the Baltimore City public schools over a five-year period. The Consent Decree, by its terms, specified that it would not become fully effective until "(a) the Governor signs the partnership legislation in a form that does not affect the substantive rights of the parties established by this Decree, and (b) the State Budget for FY 1998 is approved with the additional funds for FY 1998...." The Consent Decree further specified that if these contingencies have not occurred by May 1, 1997, the Consent Decree "shall be null and void" and trial of the cases would proceed in the Circuit Court for Baltimore City on May 7, 1997. The Consent Decree incorporated a proposed twenty-page legislative enactment conforming with

---

4. The federal case is entitled *Vaughan G. et al. v. Mayor et al.,* Civil Action No. NJG—84—1911 in the United States District Court for the District of Maryland.

and in implementation of the provisions of the Joint News Release. It provided that if the "partnership legislation" is enacted with any variance from the proposed measures, the parties may waive the variances in writing. It further provided that if any variance is not waived in writing, any party may file a motion with the court, within a specified time limit, "seeking a determination whether the variance affects the party's substantive rights under the [Consent] Decree." It was also specified that if the General Assembly revises or modifies the "partnership legislation after the 1997 Legislative Session and before the expiration of the Consent Decree, all parties reserve the right to challenge any variance."

By its further terms, the consent Decree "shall be in effect through June 30, 2002 unless the Court extends the term upon timely motion of one of the parties and upon a showing of good cause to extend the Decree." Finally, the Consent Decree provided that the Circuit Court for Baltimore City would retain "continuing jurisdiction during the term of this Decree to monitor and to enforce compliance" with its provisions; and that any party to the Decree may seek to enforce its terms but that notwithstanding termination of the Decree, the circuit court would retain jurisdiction to resolve any dispute that may have arisen during the terms of this Decree.

On December 9, 1996, after full briefing by the parties, we heard oral argument of Montgomery County's challenge to the denial of its intervention motions in the Bradford and City cases.

## II

The parties disagree as to the correct legal standard governing the applicability of the provisions of Rule 2–214(a), (which as amended we adopted in 1984) to the cases now before us. It is, therefore, necessary that we carefully consider the import of the cases relied upon by each side. In this regard, we again note that the opinion of the Court of Special Appeals in *Birdsong,* upon which the plaintiffs place primary reliance, was decided in 1987 under present Rule 2–214(a);

while Montgomery County places principal reliance upon *TKU*, decided in 1976 under the provisions of former Maryland Rule 208(a). That Rule provided that upon timely application a person shall be permitted to intervene as a matter of right in an action "(a) where the representation of the applicant's interest by existing parties is or may be inadequate *and the applicant is or may be bound by a judgment in the action."* (Emphasis added.) In *TKU*, we observed that the language of then governing Rule 208(a) was identical to Fed. R.Civ.P. 24 (hereafter, the Federal Rule) as it stood prior to 1966. 276 Md. at 710–711, 351 A.2d 133. We observed in *TKU* that by that time "a division of authority had emerged in the reported federal decision regarding the requirement that the applicant for intervention "is or may be bound by a judgment in the action." *Id.* We noted that most cases deciding the question interpreted the word "bound," as used in the Federal Rule, narrowly in requiring a showing that the judgment would have a res judicata effect upon the would-be intervenor. *Id.* But we recognized that a "stubborn minority" clung to the view "that a more utilitarian and realistic interpretation should be applied, permitting intervention whenever a judgment would put the applicant at a practical disadvantage in his own litigation or would substantially affect the would-be intervenor's ability to protect his interest." *Id.*[5] We further observed in *TKU* that with "an obvious view to the minority position, the 1966 amendment to Federal Rule 24 changed the intervention as of right test to permit intervention "when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." *Id.* We also opined that the primary purpose of the 1966 amendment to the provisions of then Federal Rule 24 "was to relax the test for intervention of right by replacing the

---

5. The cases representing the competing holdings on this issue are collected at footnotes 4 and 5 in *TKU*, 276 Md. at 711, 351 A.2d 133.

'res judicata rule' with the less onerous one requiring the applicant merely to show that *he might be disadvantaged* by the disposition of the action in which he had sought to intervene." *Id.* at 711, 351 A.2d 133. (Emphasis added.) We next said that "the requirement which we imposed upon the applicant for intervention under [then] Rule 208(a) is that he have an interest for the protection of which intervention is essential and which is not otherwise protected," citing our 1964 one-page opinion in *Shenk, supra,* 235 Md. at 327, 201 A.2d 498. *Id.* at 712, 351 A.2d 133. We added the further statement that "[T]his standard is wholly compatible with the current language of Federal Rule 24," and that the federal cases defining Rule 24 "continue to serve as a guide to our interpretation of Rule 208(a)." *Id.* at 712, 351 A.2d 133. In sum, we concluded in *TKU* that whether the applicant for intervention "has an interest which it is essential to protect may be equated with the requirement of Rule 208(a) that he 'is or may be bound by a judgment in the action.'" *Id.* We concluded on the facts in *TKU,* in permitting intervention as of right, that the case was one dealing "with a transaction in which appellants claim an interest [which] may as a practical matter impair or impede their ability to protect that interest." *Id.* at 713, 351 A.2d 133.

In *Board of Trustees v. Mayor and City Council of Baltimore,* 317 Md. 72, 562 A.2d 720 (1989), an intervention of right case decided under present Rule 2–214(a), we pointed out that "to show that the disposition of an action may as a practical matter impair or impede ... [the applicant's] ability to protect his interest" requires that the applicant "merely show that he might be disadvantaged by the disposition of the action in which he sought to intervene ... [and] need not make the additional showing that the disposition of that action would be res judicata as to him." *Id.* at 89, n. 19, 562 A.2d 720.

In *Shenk,* decided in 1964 under former Rule 208(a), the would-be intervener was a free shareholder in a savings and loan association which was placed in receivership; she sought to intervene as a matter of right in the receivership proceedings in order to be "kept informed" in the event that "some

future aspect of the proceedings affect[ed] her interests adversely." *Id.* We there said that under Maryland law "a person not a party will not be permitted to intervene in litigation unless he has an interest which it is essential to protect and which is not otherwise protected." 235 Md. at 327, 201 A.2d 498. In denying intervention, we said that her interest was "merely speculative and affords no present basis upon which to become a party to the proceedings" under then Rule 208(a).

The *Birdsong* intervention case focused on the provisions of Rule 2–214(a) that a person seeking to intervene as of right must claim "an interest relating to the property or transaction that is the subject of the action." 69 Md.App. at 626, 519 A.2d 219. The court said that in order to be a ground for intervention, "the interest asserted must be one *which it is essential to protect* and which is not otherwise protected," citing *TKU*, 276 Md. at 712, 351 A.2d 133, (Emphasis added.); *Shenk*, 235 Md. at 327, 201 A.2d 498, and *Donaldson v. United States*, 400 U.S. 517, 518, 91 S.Ct. 534, 536, 27 L.Ed.2d 580 (1971), the latter case holding that the interest contemplated by the Federal intervention rule, which was virtually identical to Maryland Rule 2–214(a), is a "significantly protectable interest." *Id.* at 626, 519 A.2d 219. The court in *Birdsong* found that the asserted interest was insufficient to warrant intervention. The argument in favor of intervention, the court said, was "predicated on the possible occurrence of two events": an award of damages against a defendant and an attempt to enforce such an award against an insurance company. *Id.* at 628, 519 A.2d 219. The court recognized that while there may be some substance to the insurer's fears concerning these events, they were "merely speculative" and afforded no present basis upon which to become a party to the proceedings. *Id.* The insurer's interest in the outcome of the trial on the issue of damages was said by the court to be "a contingent interest rather then the 'direct, significant legally practicable interest' required for intervention as of right." *Id.*

### III

In undertaking to convince us that both the trial court and Court of Special Appeals erred in rejecting its motions to intervene in the Bradford and City cases, Montgomery County asserts that it is the most populous county in Maryland and ranks behind only Baltimore City and Prince George's County in the number of "at-risk" students within its borders. It says that it serves as the principal source of funding for the Montgomery County public school system and that because of the impact of existing "equalization" of State funding, it provides 77% of the operating revenues of its school system, while Baltimore City provides approximately 29% to operate its school system. The County suggests that any significant increase in overall State education funds being unlikely, the only realistic way to devote substantial additional financial resources to the Baltimore City public school system would be by the use of a still steeper equalization formula which would further reduce already scarce State funds for the Montgomery County schools, and thereby cause an increase in the County's local support obligations.

At stake in these cases, according to the County, is a determination of what constitutes an adequate education, not merely in Baltimore City, but in every school district in the State. It therefore claims a direct interest in a court ruling that potentially could affect the nature, extent and costs of the instructional program which it is required to fund, particularly so in connection with "at-risk" children. As to these "at-risk" children, Montgomery County posits that they generally create a greater demand for social, medical and police services than do other children, and their circumstances outside the classroom may impede their ability to benefit fully from a basic or adequate education. Moreover, the County maintains that any court decision that construed Article VIII, § 1 of the Maryland Constitution to obligate boards of education to provide otherwise discretionary social, medical or police services to "at-risk" children would have immense financial consequences to Montgomery County. These burdens, the County suggests, would result not only from the indirect impact that

such costs would have in Montgomery County, but also directly in Montgomery County due to its large population of "at-risk" children.

The County next refers to its long history of supporting public education and describes how it has provided more than a basic or adequate education to its students in accordance with its "local policy prerogative that it desires to preserve." As to this, it says that its ability to fulfill its role as the largest source of funding for an adequate education, or for any enhancements thereof, could be threatened if it were required to enhance substantially its local contribution in order that other jurisdictions might have greater State funds or dramatically increase services provided directly to the large number of "at-risk" children presently within its school system.

The County argues that both lower courts applied an overly restrictive standard for intervention which is inconsistent with this Court's *TKU* case. But, says the County, under either the *TKU* standard or the more restrictive *Birdsong* standard, the County's interests were sufficient to entitle it to intervene as a matter of right.

The County argues that it has satisfied all the requirements of Rule 2–214(a), including that it has claimed an interest relating to the subject of the action and has demonstrated that disposition of the action may as a practical matter impair or impede the ability to protect that interest.

Montgomery County further maintains that with its own high number of "at-risk" students, it has obvious concerns and interest over the impact upon its local funding obligations that would ensue if steeper equalization were required to fund increased revenue requirements of other school systems. Moreover, the County expresses concern that if minimum constitutional standards for the education of "at-risk" children were set at an unnecessarily high level, there would be a direct and immediate impact on Montgomery County, not just due to increased costs in Baltimore City but also due to increased costs of its own in the furnishing of an adequate education to the large population of "at-risk" children within its own borders. In this regard, Montgomery County sees as

a fundamental issue "the degree to which the command for a 'thorough and efficient system of free public schools' encompasses the furnishing of social and other services." In this connection, the County poses the question whether an adequate education becomes constitutionally inadequate if there is a failure of other agencies to provide discretionary social, medical or police services.

The County thus claims that a decision in the Bradford and City cases could seriously impact funding requirements of the public school system that Montgomery County is required by law to support. The County contends that its financial obligation for the support of its local public school system has increased dramatically over the past decade while the State's share has declined. As a result, the County says that it has a vital interest in preserving State funding levels and avoiding further unnecessary erosion. Accordingly, the County takes the position that it has a direct interest in any court decision that would establish the level of resources that constitutionally must be devoted to a large segment of the student population within its own borders. And should the court find a constitutional violation, the County contends that it would have a concrete interest in the remedies that the court might fashion; these remedies could include elimination or alteration of the traditional shared responsibility for the funding and operating of local public school systems.

In sum, Montgomery County urges that its intervention motions should have been granted under Rule 2–214(a) in that (1) they were timely filed, (2) the County had a clear interest in the subject of the actions, i.e., determination of the level of education constitutionally required for children generally, including "at-risk" children, and that (3) disposition of the actions, as a practical matter, might impair or impede its ability to protect that interest, and (4) the representation by existing parties was not adequate.

## IV

The phrases "essential to protect," "essentiality of interest," and "might be disadvantaged," used in some of our

cases in describing components of the provisions of Rule 2–214(a), do not of themselves constitute the legal standard to be applied in determining whether intervention of right was properly denied in these cases; it thus bears emphasis that Montgomery County's motions to intervene as of right in these cases as a party defendant under Rule 2–214(a) requires that it carry the burden of establishing "an interest relating to the property or transaction that is the subject of the action," and further establish that it is "so situated that the disposition of the action may, as a practical matter, impair or impede the ability to protect that interest." The "transaction" in these cases, i.e. the two lawsuits, is limited in scope to the plaintiffs' claim that the State has failed to provide the requisite resources and services to the Baltimore City public schoolchildren necessary to fulfill its constitutional obligation to provide these students with an adequate education in conformity with contemporary educational standards. While the plaintiffs acknowledge that mismanagement of the available resources by the City's public schools may be partially to blame, they say that the State is legally responsible as well for any such mismanagement.

We are in basic agreement with the Bradford and City cases plaintiffs' conclusion that Montgomery County's "concerns" with the relief prayed in their cases is insufficient to bring its intervention motions within the ambit of Rule 2–214(a)(2). We find no basis for Montgomery County's intervention on the ground that should the plaintiffs prevail in their lawsuits, the State will reduce the County's share of State funding for its own schools in order to finance ordered improvements to the Baltimore City school system. The County's further concern that it will also be compelled to increase local property taxes to make up the shortfall is both remote and speculative and affords no ground for intervention as of right. Indeed, any impact on the County is contingent upon the happening of those uncertain and speculative events, and none would follow automatically from a judgment for the plaintiffs in these cases. In this regard, we share the plaintiffs' view that a judgment in their favor will not automatically or necessarily result in any

of Maryland's current public school funding resources being diverted from their current uses to provide additional funding for the City's public schools. Moreover, the concern expressed by the County in this regard, namely that it may at some time in the future have an effect on its share of the State's education budget, or its tax burden, is far too remote and indefinite to justify intervention under Rule 2–214(a).

Nor is there any merit in Montgomery County's further contention that it has a protectable legal interest in avoiding the potential impact that a ruling in plaintiffs' favor would have on its own population of "at-risk" schoolchildren. In this connection, the County maintains that should the plaintiffs be successful in persuading the court that "at-risk" children in Baltimore City public schools require enhanced educational resources and services pursuant to Article VIII, § 1 of the Maryland Constitution, then at some later time the County, at considerable additional expense, may be required to supplement the resources which it currently provides to its own "at-risk" schoolchildren.

As to this, the County's concerns are indirect, remote, and speculative; they do not focus directly on the "transaction" involved in these cases, viz, whether the plaintiffs' actions, directed, as they are, *solely* to the constitutional adequacy of the education provided to children in the Baltimore City public schools, implicates Montgomery County's legal interest in any way which would give it a right to intervene in these cases under Rule 2–214(a). Were it otherwise, according to the plaintiffs, and that was all that was needed to establish a right to intervene, then any applicants' generalized interest in participating in the formulation of a constitutional standard, to which the person may be subjected, could intervene as a party from which an interpretation of a constitutional provision might emerge. We share the plaintiffs' position on this issue.

■ The significant legally protectable interest which Montgomery County next claims to support its intervention motions derives from its concern that disposition of the Bradford and City cases might result in a transformation of the

current State-local educational financing scheme. As to this, the plaintiffs say, and we agree, that the County's position is based on supposition and speculation, and there is nothing in the relief sought in these complaints that seeks a general overhaul of the entire system of local management.

## V

The cases before us involve nothing more than Montgomery County's motion to intervene and we do not therefore consider the merits of the underlying cases. At the time these motions were decided by the trial court and by the Court of Special Appeals, the parties had not entered into an agreement to settle the cases without trial. Nor at that time had a consent decree been entered by the circuit court with the approval of all parties to the case. The Decree incorporated a proposed legislative enactment for approval by the General Assembly; it called for a State appropriation of $254,000,000 over a five-year period with initial funding in fiscal year 1998 of $30,000,-000. The Governor included first-year funding for this project in his 1998 fiscal year proposed budget. The proposed legislative enactment was introduced in the General Assembly as Emergency HB 312 in January, 1997, and no action has yet to be taken on the measure. The partial summary judgment entered by the circuit court on October 18, 1996 to the effect that the schoolchildren in Baltimore City were in fact denied their right to a constitutionally adequate education, was not supported by any evidentiary findings by the court insofar as the record discloses. The entry of the partial summary judgment would thus appear to have thereafter supported the parties' agreement to the entry of the Consent Decree.

While Montgomery County views these subsequent events to demonstrate that its motions to intervene were neither contingent nor speculative, we do not take them into account in our disposition of Montgomery County's intervention motions. In the posture of the cases now before us, we can only conclude that Montgomery County's motions to intervene as of right were properly denied, and we shall therefore affirm the judgments of the Court of Special Appeals.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY MONTGOMERY COUNTY, MARYLAND.*

ELDRIDGE, dissenting.

I disagree with the majority's opinion and decision in two major respects.

First, the majority clearly errs in refusing to consider the consent decree entered in the underlying cases on November 26, 1996, and in taking the position that the decree is not before us. The majority opinion overlooks entirely the respondents' motion to dismiss Montgomery County's appeal on the ground that the consent decree has rendered the appeal moot. In order for a decree to render moot an earlier appeal from a denial of intervention, however, the decree must be within the trial court's jurisdiction. For the reasons discussed in Part I below, the consent decree in these cases is undoubtedly beyond the jurisdiction of the circuit court. It represents a foray into areas which, under Article 8 of the Maryland Declaration of Rights, are the province of other branches of government.[1]

Second, the denial of Montgomery County's motion to intervene is, under the circumstances here, contrary to reason and authority. The majority's view, that this litigation simply represents a local dispute between Baltimore City and the State, with an impact largely confined to Baltimore City, is wholly devoid of reality. Considering the allegations in the complaints, the scope and effect of the declaratory judgment sought and obtained by the plaintiffs, the important public policy questions involved, the collusive aspects of the litigation, and the public interest and need for the constitutionality of the General Assembly's enactments to be defended, the motion to

---

1.  Article 8 of the Declaration of Rights provides as follows:
    **"Article 8.  Separation of powers.**
       That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other;  and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

intervene by the largest political subdivision of the State should have been granted.

## I.

As indicated above, all of the respondents have filed in this Court a motion to dismiss the consolidated appeals on the ground of mootness. The respondents argue that the "Consent Decree" signed by Judge Kaplan and entered on November 26, 1996, has rendered moot Montgomery County's appeal from the order denying intervention. A copy of the consent decree, along with an affidavit by an Assistant Attorney General attesting that the copy is true and accurate, were filed in this Court with the motion to dismiss.

Although not cited by the respondents, there are decisions by this Court holding that a pending appeal from an order denying intervention becomes moot when a decree is entered in the underlying litigation. *Weinberg v. Fanning,* 208 Md. 567, 572, 119 A.2d 383, 386–387 (1956); *Bowles v. Moller, Inc.,* 163 Md. 670, 684–685, 164 A. 665, 670 (1933). Nevertheless, as indicated in *Weinberg v. Fanning, supra,* 208 Md. at 570, 119 A.2d at 385, in order to render moot the appeal from the denial of intervention, the trial court must have had "jurisdiction to pass the decree."

Consequently, the respondents' motion to dismiss has brought before this Court the consent decree entered on November 26, 1996. While we do not have before us all of the issues that might be raised in a direct appeal from the decree, we do have before us the question of the decree's fundamental validity. If the decree is invalid, it cannot render moot Montgomery County's appeal from the denial of intervention, and the respondents' motion to dismiss should be denied.

This Court has pointed out that, "[i]n light of the separation of powers provision of the Maryland Constitution, set forth in Article 8 of the Declaration of Rights, a court has no jurisdiction to perform a nonjudicial function," *Duffy v. Conaway,* 295 Md. 242, 254, 455 A.2d 955, 960–961 (1983). The decree entered in the underlying litigation on November 26, 1996, is

replete with provisions that go far beyond the functions of the judiciary.

Thus, paragraph 8 of the November 26th decree provides as follows:

"8. The new Board of School Commissioners for Baltimore City ('Board') shall be established as a City–State partnership and shall be held directly accountable for improving the academic achievement of Baltimore City school children as measured by the Maryland School Performance Program ('MSPP'). The Board shall not be deemed an agency of the State."

Paragraph 9 of the decree vests in the new Board "full control of all functions relating to" the Baltimore City Public Schools. Paragraphs 10 through 16 provide for the number of members of the new Board, the matter of compensation of members, the residency of members, the requirement that members "shall reflect the demographic composition of Baltimore City," and the qualifications of different groups of members. Paragraphs 17 through 20 of the decree authorize the appointment of the Board's members by the Mayor of Baltimore City and the Governor, set forth a method by which the appointments are to be made, delineate the terms of the members and the grounds for removal, provide for a chairperson, and define a quorum. Paragraphs 21 through 26 of the decree mandate that the Board "shall hire a Chief Executive Officer . . . who shall be a member of the Mayor's Cabinet," set forth requirements for the chief executive officer's "employment contract," create the position of "Chief Financial Officer," establish a "Parent and Community Advisory Board," and contain other detailed requirements concerning the management structure of the new Board of School Commissioners created by the decree. Paragraphs 27 and 28 require the new Board to adopt a "Transition Plan," and paragraphs 29 through 34 relate to a "Master Plan to increase student achievement" which must be adopted and implemented. Paragraphs 35 through 38 concern procurement and personnel, require that "all current collective bargaining agreements shall expire on June 30, 1997," and provide for new collective bargaining

agreements. Paragraphs 39 through 42 impose various duties upon the new Board.

The financial resources and funding for the new Board are provided for in paragraphs 43 through 54 of the decree. The circuit court ordered that "the State of Maryland shall provide" the Baltimore City Public Schools "with additional funds," which "shall be separate from established State funding ... and other current State funds provided to" the Baltimore City Public Schools. The court also decreed that the "additional funds provided by the State as described in this Decree shall not be provided by reducing any other State funds provided to Baltimore City." These additional state funds "appropriated" by the circuit court amount to approximately $250 million over five years, with procedures delineated in the decree for requesting more additional funds. These procedures include a provision in paragraph 53 for the appeal of certain circuit court rulings directly to the Court of Appeals.

The remaining paragraphs of the November 26th decree contain transition provisions and requirements concerning special education. The decree states that it shall be "in effect through June 30, 2002, unless the Court extends the term," and that "[t]he Court retains continuing jurisdiction during the term of this Decree to monitor and to enforce compliance with the terms of this Decree." Finally, the decree provides that it shall not be "fully effective" until the enactment of certain proposed legislation, which is attached as an exhibit to the decree, and the appropriation of the additional funds by the State budget bill.

The above-summarized decree signed by Judge Kaplan represents an unprecedented excursion beyond the outer limits of judicial authority. The decree resembles a major executive branch reorganization statute. *Compare, e.g.,* Ch. 77 of the Acts 1969.

Unless the law creating the government agency is itself unconstitutional, a Maryland circuit court has utterly no power to abolish an existing government agency such as a local

school board. A circuit court has no jurisdiction to create a new government agency, to determine whether it shall be a state or local agency, to provide for the appointments of its members by a mayor and the Governor, to mandate the qualifications of the members and the agency's structure, to delineate the agency's powers, duties and functions, or to do any of the other things set forth in the numbered paragraphs of the circuit court's November 26th decree.[2] To the best of my knowledge, none of the most sweeping court decrees involving local school systems, based on the Fourteenth Amendment and the principles set forth in *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), has ever gone so far as to abolish a local school board and create a new school board in its place, with a specified membership and structure.

Furthermore, I am unable to find in the budget and appropriations provisions of the Maryland Constitution, Article III, § 52, any role for the Circuit Court for Baltimore City. As this Court has admonished, "it must be remembered that public resources are not unlimited and there are many competing demands upon public funds." *State v. Frazier*, 298 Md. 422, 457, 470 A.2d 1269, 1287 (1984). The weighing of those competing demands is for the political branches of government.

This Court has taken the position that the separation of powers requirement in Article 8 of the Maryland Declaration of Rights prohibits conferring upon the judiciary jurisdiction to appoint the members of the Board of Visitors responsible for supervising a county jail (*Beasley v. Ridout*, 94 Md. 641,

---

**2.** Maryland Code (1978, 1997 Repl.Vol.), §§ 2–205 and 2–206 of the Education Article, grants to the State Board of Education broad supervisory authority over public schools, including the authority to accredit schools and to order that a particular school cease operations (§ 2–206(h)), and the State Board may institute legal proceedings to enforce its authority (§ 2–205(d)). Nothing in these sections, however, authorizes the abolition of a local school board or the creation of a new school board with specified organization, powers and duties.

657–660, 52 A. 61, 65–66 (1902)), to appoint school commissioners (*Beasley v. Ridout, supra,* 94 Md. at 659–660, 52 A. at 66), to review the accounts of certain county officials (*Robey v. Prince George's County,* 92 Md. 150, 159–165, 48 A. 48, 49–52 (1900)), to issue liquor or racetrack licenses (*Cromwell v. Jackson,* 188 Md. 8, 27–28, 52 A.2d 79, 86–89 (1947), *Close v. Southern Md. Agr. Assn.,* 134 Md. 629, 108 A. 209, 214–215 (1919)), to determine *de novo* whether applicants should have permits to fill wetlands (*Dep't of Nat. Res. v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 229, 334 A.2d 514, 525–526 (1975)), or to perform other functions appropriately within the province of the legislative or executive branches of government. *See, e.g., Reyes v. Prince George's County,* 281 Md. 279, 295–296, 380 A.2d 12, 21–22 (1977); *Planning Commission v. Randall,* 209 Md. 18, 25–27, 120 A.2d 195, 198–199 (1956); *Board of Supervisors v. Todd,* 97 Md. 247, 263–265, 54 A. 963, 965–966 (1903); *Baltimore City v. Bonaparte,* 93 Md. 156, 161–163, 48 A. 735, 736–737 (1901). As stated in *Planning Commission v. Randall, supra,* 209 Md. at 25, 120 A.2d at 199, "[t]he judicial department ha[s] no jurisdiction or right to interfere with the legislative process which was committed by the constitution . . . to the Legislature itself."

Under the principles set forth in the above-cited cases, there can be no doubt that the circuit court's November 26th decree was far in excess of the court's jurisdiction. Judge Kaplan, in signing and entering the decree, has purported to perform a multitude of nonjudicial functions. The circuit court has assumed a role which belongs exclusively to the legislative and executive branches of government.

Moreover, the fact that the parties to the underlying litigation consented to the decree cannot bring it within the jurisdiction of the circuit court. It is firmly settled that parties cannot confer jurisdiction upon a court by consent. *See, e.g., Sisk v. Friendship Packers,* 326 Md. 152, 158, 604 A.2d 69, 72 (1992); *Kawamura v. State,* 299 Md. 276, 282 n. 4, 473 A.2d 438, 441 n. 4 (1984); *Anthony Plumbing of Md. v. Atty. Gen.,* 298 Md. 11, 16, 467 A.2d 504, 506 (1983); *Highfield Water Co. v. Wash. Co. San.,* 295 Md. 410, 414, 456 A.2d 371, 373 (1983).

If anything, a consent judgment involving a matter of public policy is more vulnerable than other judgments to a collateral challenge based upon the lack of authority underlying the judgment. *See, e.g., Montgomery County v. Revere*, 341 Md. 366, 379–382, 671 A.2d 1, 7–9 (1996); *Green v. Sollenberger*, 338 Md. 118, 131, 656 A.2d 773, 779 (1995) (a consent adoption decree, not authorized by the adoption statutes, "is voidable and subject to collateral attack at any time").

Similarly, the conditional provisions in the November 26th decree do not cure the lack of jurisdiction. If a decree contains orders and directives beyond the subject matter jurisdiction of a court, the insertion of a clause making the decree contingent upon the passage of particular legislation or budget bill provisions does not change the fact that the orders and directives are beyond the court's jurisdiction. Otherwise, a judge could order anything he or she desired as long as the order was made conditional. For example, it is a common practice for the General Assembly to enact legislation contingent upon the enactment of other legislation or budget bill provisions. Nevertheless, the enactment of such contingent legislation remains a legislative and not a judicial function. A court does not have co-equal authority to enact legislation contingent upon the passage of other legislation.

Furthermore, the conditional nature of the decree may disappear. If the conditions are met, or if the parties waive the need for particular conditions to be met (and such waiver is provided for in this decree), then the decree will purportedly be fully enforceable as any other type of equitable judgment. Parties could be held in contempt for violating parts of the decree.

Finally, like the factor of consent, the conditional nature of the decree makes it more vulnerable to a collateral challenge and not less vulnerable. The Court of Special Appeals recently held in *Southern Four v. Parker*, 81 Md.App. 85, 93, 566 A.2d 808, 812 (1989), with regard to conditional judgments:

" 'It is a general rule that [a] judgment must not be conditioned on any contingency, and it has been held that a conditional judgment is wholly void.' "

Later, the appellate court reiterated that a " 'conditional decree, one that does not operate in praesenti, but is to become operative on the occurrence of some condition, is void.' " *Southern Four v. Parker, supra,* 81 Md.App. at 94, 566 A.2d at 812, quoting with approval *Burger v. Burger,* 481 S.W.2d 632, 634 (Mo.App.1972). The Court of Special Appeals explained this principle as follows (81 Md.App. at 94, 566 A.2d at 812, quoting with approval *Wallace v. Hankins,* 541 S.W.2d 82, 84 (Mo.App.1976)):

" 'A conditional judgment or decree is one whose enforcement is dependent on the performance of future acts by a litigant and is to be annulled if default occurs. An alternative judgment or decree is for one thing or another but does not declare in a definitive manner which alternative will ultimately prevail. Conditional and alternative judgments and decrees are wholly void as they do not perform in praesenti and leave to speculation and conjecture what their final effect may be. In other words, under conditional or alternative judgments and decrees, the final resolution of the cause is consigned to the accomplishment vel non of future acts whose actual performance or nonperformance are matters dehors the record.' "

This Court in *Duffy v. Conaway, supra,* 295 Md. at 261, 455 A.2d at 964, quoting from *Tanner v. McKeldin,* 202 Md. 569, 576–577, 97 A.2d 449, 452 (1953), stated "that a controversy, to be justiciable, must be 'capable of final adjudication by the judgment or decree to be rendered.' " We went on to hold in *Duffy,* 295 Md. at 261–262, 455 A.2d at 965, that a Maryland court has no jurisdiction to render a "judgment" which is " 'purely tentative' " and subject to implementing action by the General Assembly. Under the principles set forth in *Duffy,* the November 26th decree in the instant case would be invalid even if the circuit court had jurisdiction to abolish school boards, create new government agencies, etc.

For all of the foregoing reasons, most of the circuit court's November 26th decree, including all of the numbered paragraphs, is beyond the subject matter jurisdiction of the circuit court and is void. The respondents have brought the issue of the decree's validity before this Court by their motion to dismiss. In addition, a judgment beyond the trial court's jurisdiction is subject to a collateral challenge at any time. Furthermore, this Court will sua sponte strike down a judgment beyond the trial court's jurisdiction. *Duffy v. Conaway*, *supra*, 295 Md. at 254, 455 A.2d at 961.

It should be emphasized that the parties' agreement to recommend to the General Assembly particular legislation and appropriations relating to the public school system is not my concern. From a public policy standpoint, the recommendations may well be desirable. That is a matter for the political branches of government and not the judiciary. Moreover, the parties are fully entitled to settle pending litigation. The present litigation could have been dismissed after the parties entered a settlement agreement. What is objectionable in this case, from a jurisprudential standpoint, is the role of the circuit court, the insertion into the court's decree of orders which are beyond the court's jurisdiction, and the court's usurpation of the Legislature's function. The various numbered paragraphs of the November 26, 1996, decree are void, and the people of Maryland are entitled to be so informed.

II.

A.

In upholding the denial of Montgomery County's motions to intervene in these two cases, the majority largely accepts many of the respondents' self-serving characterizations of this litigation, as well as some of the Court of Special Appeals' characterizations of the *Bradford* case, and the majority ignores the actual allegations and theories set forth in the plaintiffs' complaints. For purposes of intervention, the majority views this case as if it were ordinary litigation with its impact limited to Baltimore City.

Thus, the majority opinion states that the *Bradford* plaintiffs alleged that the State was constitutionally responsible for "educational deficiencies in the Baltimore public school system due to various economic, social, and educational factors *peculiar to Baltimore City* " (Op. at 178–179, emphasis added), that the *Bradford* complaint "focuses solely on the children in the Baltimore City public school system" (*id.* at 187), and that both lawsuits are "directed ... *solely* to the constitutional adequacy of the education provided to children in the Baltimore City public schools" (*id.* at 200, emphasis in original).[3]

In actuality, however, the *Bradford* complaint was brought on behalf of an alleged class of "at risk" students which the complaint defined as follows:

" 'At-risk' students are those who experience circumstances of economic, social and/or educational disadvantage that substantially increase the likelihood that they will fail to obtain an adequate education in public school.

"8.  Students who are 'at risk' include those who:

(a) live in poverty (usually defined for educational purposes by their eligibility for free or reduced price school meals);

(b) attend schools with a high proportion of students living in poverty (more than thirty percent eligible for free or reduced price meals);

(c) live with fewer than two parents;

(d) have parents who did not themselves graduate from high school;

(e) live with parents who are unemployed;

---

**3.**  The state constitutional provision, which the plaintiffs in both cases contend has been violated, is Article VIII, § 1, of the Maryland Constitution, which states as follows:

"**Section 1.  General Assembly to establish system of free public schools.**

"The General Assembly, at its First Session after the adoption of this Constitution, shall by Law establish throughout the State a thorough and efficient System of Free Public Schools;  and shall provide by taxation, or otherwise, for their maintenance."

(f) are homeless;

(g) are parents or pregnant;

(h) live under the threat of violence at home or at school;

(i) have been retained in grade on at least one occasion;

(j) score more than one year below grade level on standardized testing measures; or

(k) have otherwise been determined to be in need of remedial education."

Although the *Bradford* plaintiffs limited their action to the "at risk" students in Baltimore City, they acknowledged that there were "at risk" students, under the above-quoted definition, throughout the State. The *Bradford* complaint went on to allege that the "State's constitutional duty to provide for an adequate education runs to every school-aged child throughout Maryland," and that this duty applies to "at risk schoolchildren in Baltimore City ... [and] in other communities and school districts in Maryland." In contending that the constitutional inadequacy of the present public school system is shown by the failure of students to meet state prescribed performance standards, the *Bradford* complaint acknowledged that the students in "many" Maryland school districts fail to meet these standards.

The amended complaint in the *Baltimore City* case, which asserted that the adequacy of education should be measured by performance under standards adopted and applied by the State Board of Education, alleged that in 1990 "none of the Maryland school districts met satisfactory standards," and that, four years later, "only three school districts demonstrated educational adequacy." Montgomery County was not one of those three districts. The amended complaint in the *Baltimore City* case contained more allegations detailing the inadequate performances of children throughout the State measured by various tests, concluding that "[c]ontemporary qualitative educational standards established by ... the State Board still are not being met in *many districts,* including Baltimore City" (emphasis added), and that these failures

"present concrete evidence that Defendants have failed to fulfill their duty under Article VIII to provide for the maintenance of a basic public school education." Later the *Baltimore City* amended complaint asserted that "[t]he qualitative standards of the MSPP are not being met in any school district in the State."[4] The basic theme of the *Baltimore City* case, set forth in paragraph 53 of the amended complaint, was as follows (emphasis added):

"Defendants, in violation of the education clause [Article VIII, § 1], have failed to appropriate increases in State education funding necessary *for all school districts,* particularly Baltimore City, to provide *all students* with a basic public school education."

The majority opinion also indicates that this litigation is not primarily about money. The majority opinion states that the *Bradford* plaintiffs "sought a court order requiring the State to work with the plaintiffs and Baltimore City to improve the City's public schools so that they provide an adequate education" (Opinion at 179), but the majority mentions nothing about the *Bradford* plaintiffs' request for funds. The majority also says that the *Bradford* complaint "did not directly attack the constitutionality of the system of public school funding which we upheld in *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 458 A.2d 758 (1983)." (Op. at 180). The majority opinion points to the state defendants' contention that " 'money' . . . is not the primary subject of the litigation." (*Id.* at 183). In describing the allegations of the amended complaint in the *Baltimore City* case, the majority merely says that the plaintiffs "sought by way of relief that the State provide a constitutionally adequate education." (*Id.* at 185).

Contrary to the view of the majority, an examination of the two complaints demonstrates that these cases are chiefly about money from the State.[5] The crux of the *Bradford*

---

**4.** "MSPP" stands for "Maryland School Performance Program."

**5.** Any reader of the newspapers circulated in Maryland over the past several months would also know that these cases are all about money.

plaintiffs' case was set forth in paragraphs 41, 136, and 137 of their complaint as follows (emphasis added):

"41. The State of Maryland and the defendants have failed to provide schoolchildren in Baltimore City with an adequate education. In particular, the defendants have failed to provide resources sufficient and appropriate to enable BCPS [Baltimore City Public Schools] to meet or make meaningful progress toward meeting contemporary education standards, especially with respect to at-risk students. . . .

\* \* \* \* \* \*

"136. Pursuant to its obligations under the Education Clause of the Maryland Constitution, the General Assembly has established a mechanism for funding elementary and secondary education from a combination of State and local appropriations.

"137. The principal cause of the inadequate education available to plaintiff schoolchildren, which results in the constitutional violation set forth above, is the lack of adequate resources. Under the constitution, *the State is legally responsible for ensuring that* the combination of state and local *funding is adequate* to meet the needs of BCPS's school population, and the *State's failure to assure such funding adequacy violates [its] constitutional duty.*"

The *Bradford* plaintiffs in the first paragraph of their complaint disclaimed any intent to relitigate the issues dealt with in *Hornbeck v. Somerset Co. Bd. of Educ., supra,* 295 Md. 597, 458 A.2d 758, which concerned, *inter alia,* the differences in total per pupil funding among the various Maryland subdivisions (295 Md. at 613–615, 458 A.2d at 766–768), and in which this Court held that the Maryland Constitution "does not mandate uniformity in per pupil funding and expenditures among the State's school districts" (295 Md. at 631, 458 A.2d at 776). Nonetheless, the later paragraphs of the *Bradford* complaint specifically challenged the differences in per pupil funding between Baltimore City and other school districts, complaining that Baltimore City

"cannot devote as great a share of its resources to regular instruction as do other school districts.

"134. In 1992–93, BCPS spent only $2,437 per student on current instructional expenses (less adult education), the lowest of any school district in Maryland. The statewide average for current instructional expenses was $2,926, nearly 20% higher than that in BCPS. As a result of BCPS's below-average spending, a classroom of 30 students in BCPS received approximately $17,000 less to spend on current instructional needs than a similar size classroom in an average-spending school district in Maryland."

It is obvious from a reading of the entire *Bradford* complaint that the plaintiffs' request for a court order requiring the State to take steps to "provide an adequate education" meant that the State should provide more funds. As paragraph 137 of the complaint, quoted previously, makes clear, the requested "adequacy" in public education means "funding adequacy."

The amended complaint in the *Baltimore City* case made little effort to disguise that the plaintiffs' constitutional challenge was to the present system of public school funding, and that what the plaintiffs sought was more state money. In their amended complaint's "Preliminary Statement," the *Baltimore City* plaintiffs stated that they wanted

"injunctive relief ... directing that Defendants provide 'by taxation or otherwise' sufficient assistance and resources to Baltimore City Public Schools ('BCPS') so that BCPS can make available to all school-aged children residing in Baltimore City the opportunity for a basic public school education."

Echoing the complaint in the *Hornbeck* case, the amended complaint in the *Baltimore City* case alleged in paragraph 34 that "Baltimore City students perform worse on the MSPP than those school districts that are able to spend more funds for education" and "that in school districts where more money is available, students perform better." Paragraph 34 continued:

"The performance of Baltimore City, particularly as compared to suburban districts which have greater fiscal capacities, shows that the financing scheme dependent upon local wealth and ad hoc categorical State aid does not provide school districts that have limited fiscal capacities with the means essential to provide a basic public school education."

The *Baltimore City* amended complaint repeatedly attacked the Maryland system of shared State and local fiscal responsibility for the public schools.[6]

---

6. For examples, *see* paragraphs 39, 40, 45, 53, 54 and 55 of the amended complaint, alleging as follows:

"39. In 1990, when Maryland was the eighth richest state in the United States, it fell to 42nd in the nation in its monetary contribution to public education. Overall, in fiscal year 1992, local government provided fifty-five (55%) percent of the funding for public schools.

40. Insufficient State expenditures for public education require that local Boards of Education be fiscally dependent on financing from the local government through income and property tax revenues. . . .

\* \* \* \* \* \*

45. Under Maryland's public school financing plan, a school-aged child's opportunity to obtain adequate education, undeniably, is dependent upon the ability of the local political jurisdiction, in which he or she happens to live, to raise local taxes. To even be eligible to receive the State's 'share' of basic current expenses, local jurisdictions must be able to levy taxes sufficient to provide their local share as determined by the foundation formula. § 5–202(b)(3). Local appropriations also must keep pace with enrollment and match or exceed spending in the prior year.

\* \* \* \* \* \*

53. Defendants, in violation of the education clause, have failed to appropriate increases in State education funding necessary for all school districts, particularly Baltimore City, to provide all students with a basic public school education.

54. Despite increasing evidence that the State's public school financing plan is insufficient to provide for the maintenance of adequate education that is effective in all districts, the Defendants consistently have resisted local efforts to obtain sufficient State funds for the maintenance of a basic public school education. The full funding estimated as needed at the local level for public education in the State Budget for fiscal years 1994, 1995, and 1996 was not appropriated.

55. Defendants have had ample time to provide for the maintenance of adequate education. Without sufficient State funds or assistance to provide its children with a basic public school education, Balti-

The specific constitutional actions or inactions by state officials and entities which were complained about in the *Baltimore City* case appeared to be the failures of Governors to include sufficient state funds for public schools in the annual budgets submitted to the General Assembly (paragraph 51 of the amended complaint) and the General Assembly's breach of its "duty to enact a 'Supplementary Appropriations Bill' or other legislation to ensure that a thorough and efficient public school system is provided for, even if the Governor's annual budget does not meet that constitutional mandate." (Paragraph 52).

In their "Prayer For Relief," the *Baltimore City* plaintiffs asked the court, *inter alia*, to "[o]rder Defendants to design an enhanced system of public school finance for implementation by the General Assembly which assures that all mandates for education as established by Defendants are properly funded" and to "[o]rder Defendants to provide BCPS with … funding to the fullest extent necessary for BCPS to provide a basic public school education to school-aged children in BCPS as defined by contemporary qualitative educational standards." Consequently, the plaintiffs sought a new and "enhanced" system of public school funding in place of the existing system.

Article VIII, § 1, of the Maryland Constitution makes no reference to localities or subdivisions. The section imposes a duty upon the statewide legislative body to establish a thorough and efficient public school system "throughout the State…." The plaintiffs in these cases requested a declaratory judgment that the General Assembly has violated Article VIII, § 1. The *Bradford* complaint described a group of "at risk" students, based on a list of social, personal, and economic factors, which has members in every Maryland subdivision. As reviewed above, the complaints in both cases alleged that the education being received by public school students throughout the State, and particularly "at risk" students, was

more City is impeded in carrying out its statutory duty to establish and maintain a system of free public schools for its students."

constitutionally inadequate. The plaintiffs in each case contended that the existing state public school financing system and formulae, based on shared State and local fiscal responsibility, were constitutionally deficient. They wanted a new financing system.

These allegations of unconstitutionality, and the type of declaratory judgment which might have resulted, equally concern all Maryland counties as well as Baltimore City. If, as alleged, the "at risk" students throughout the State are receiving a constitutionally inadequate education, this applies to Montgomery County as well as Baltimore City. If the failure to meet the standards of state performance programs demonstrates a constitutionally inadequate education, then, under the complaints' allegations, the education provided in all school districts is unconstitutional. If the State has failed to provide the "funding necessary for all school districts," as alleged, this failure relates to counties as well as to Baltimore City. The plaintiffs' challenge to the financing system and formulae applies throughout the State. When the parties' self-serving characterizations of the cases are overlooked, and when the actual allegations of the complaints are examined, it is obvious that these cases are not very different from *Hornbeck v. Somerset Co. Bd. of Educ.*, *supra*, in which Montgomery county was allowed to intervene.

Montgomery County clearly has "an interest relating to the property or transaction that is the subject of the action" within the meaning of Maryland Rule 2–214(a) relating to intervention of right. The two lawsuits are attacking the statewide public school system, provided under Article VIII, § 1, of the Maryland Constitution, with its principal feature being shared State and local government responsibility. Montgomery County is as much a part of that system as is Baltimore City. If a declaratory judgment invalidating the present system and formulae for public school financing were rendered, Montgomery County obviously "might be disadvantaged by the disposition of the action," *Board of Trustees v. Mayor and City Council of Baltimore*, 317 Md. 72, 89 n. 19,

562 A.2d 720, 728 n. 19 (1989), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990); *Citizens Coordinating Comm. v. TKU,* 276 Md. 705, 711, 351 A.2d 133, 137 (1976).[7]

The majority opinion holds that Montgomery County does not have a sufficient "interest" for intervention as of right because "[t]he 'transaction' in these cases, i.e. the two lawsuits, is limited in scope to the plaintiffs' claim that the State has failed to provide the requisite resources and services to the Baltimore City public schoolchildren necessary to fulfill its constitutional obligation. . . ." (Opinion at 198). As previously demonstrated, however, this is simply not accurate. The allegations of unconstitutionality are not limited in scope to Baltimore City public school students.[8]

It is true that the plaintiffs, while attacking the constitutionality of the public school system throughout the State, attempt to limit the relief sought to Baltimore City. Of course, a declaratory judgment need not be in the form requested by the plaintiffs. *See Harford Mutual v. Woodfin,* 344 Md. 399,

---

**7.** The majority opinion may seem to intimate that the "might be disadvantaged" standard set forth in *Citizens Coordinating Comm. v. TKU,* is no longer applicable since that case was decided under a former rule, and that the Court of Special Appeals' opinion in *Hartford Ins. Co. v. Birdsong,* 69 Md.App. 615, 519 A.2d 219 (1987), decided under present Rule 2–214(a), disapproved of *TKU* and set forth a more stringent test for the interest of the applicant to be sufficient for intervention. I find nothing in the *Birdsong* opinion disapproving of this Court's earlier *TKU* opinion, or stating that the "might be disadvantaged" standard is no longer applicable. Moreover, the *Board of Trustees* case was an opinion of this Court, decided under the present rule, and decided subsequent to *Birdsong.* In *Board of Trustees,* we reaffirmed the "might be disadvantaged" standard.

**8.** The majority also indicates that, if the plaintiffs obtain the millions of dollars in additional state funds which they seek, any financial impact upon Montgomery County would be "speculative." I wonder where the majority believes that over 250 million dollars of additional state funds will come from. There is not, to the best of my knowledge, a money tree in Annapolis supplying the state treasury. A large amount of additional State money for one subdivision comes from the taxpayers in all subdivisions, and the taxpayers in Montgomery County supply more of that money than do the taxpayers in any other single subdivision.

414–415, 687 A.2d 652, 659 (1997), and cases there cited. More importantly, I do not believe that plaintiffs, simply by limiting the scope of the relief requested, can prevent intervention by an applicant with a clear interest in the subject matter of the litigation. For example, could owners of wetlands in Anne Arundel County bring an action to declare the statewide wetlands statutes [9] unconstitutional, on grounds that would be applicable throughout the State, but, by merely asking that the phrase "as applied in Anne Arundel County" be appended to the declaratory judgment, succeed in keeping out of the lawsuit owners of wetlands in other counties with a different point of view? I do not believe that the principles of intervention under Maryland law can be so easily manipulated.

Montgomery County had an "interest relating to the ... transaction that is the subject of the action" within the meaning of Rule 2–214(a) and, therefore, was entitled to intervene as of right.[10]

## B.

There is another factor in these cases, which the majority refuses to consider, but which clearly justifies intervention by an interested person or entity willing to defend the General Assembly's enactments relating to Maryland's public school system. The cases have, to a degree, become collusive, with no existing party defending the constitutionality of the public school system.

---

**9.** Maryland Code (1974, 1990 Repl.Vol.), §§ 9–101 through 9–310 of the Natural Resources Article.

**10.** Montgomery County alternatively sought permissive intervention under Rule 2–214(b), and this was also denied by the circuit court. "Denial of intervention, sought either as a matter of claimed right or by permission, is an appealable final order." *Maryland Life & Health Ins. v. Perrott,* 301 Md. 78, 87, 482 A.2d 9, 13 (1984), and cases there cited. Even if it be assumed, *arguendo*, that Montgomery County was not entitled to intervene as of right, I would hold that the circuit court abused is discretion in denying permissive intervention.

(1)

Although there was opposition to the entry of the partial summary judgment declaring that Article VIII, § 1, of the Maryland Constitution was violated with regard to Baltimore City public school children, nevertheless the "Consent Decree" of November 26, 1996, incorporated by reference the partial summary judgment. The consent decree declared

> "that Article VIII, Section 1, of the Maryland Constitution requires that the General Assembly provide all students in Maryland's public schools with an education that is adequate when measured by contemporary educational standards and that the public school children in Baltimore City are not being provided with an education that is adequate when measured by contemporary educational standards."

While the decree goes on to recite that there is some dispute concerning the causes of this constitutional violation, the consent decree does constitute a declaratory judgment that the State has failed to provide some public school children with the minimum education constitutionally required. Since Article VIII, § 1, of the Maryland Constitution makes the General Assembly responsible for providing whatever may be required under that section, and since, under Article III, §§ 27–52, of the Constitution, the General Assembly fulfills its responsibilities by enacting statutes and budget bill provisions, the declaratory judgment in these cases necessarily means that at least some of the General Assembly's enactments concerning public education are constitutionally infirm.

The Maryland State Superintendent of Schools and the President of the Maryland State Board of Education, represented by the Attorney General of Maryland, expressly consented to the entire decree. Thus, the State defendants and the Attorney General have agreed with the plaintiffs' contention and the circuit court's declaration that the public education system provided for by the General Assembly, and the General Assembly's enactments regarding public education, are to some extent unconstitutional. There is no longer any party in these cases totally defending the constitutionality of these legislative enactments. The litigation has, therefore,

become collusive.[11]

When a case involving the public interest is or may become collusive, with no party defending the validity of statutes or other governmental actions, and where those statutes or actions are not clearly invalid, it is important to allow intervention in order that the statutes or governmental actions receive a defense and that both sides of the constitutional dispute be presented to the judiciary. Intervention has been allowed in such cases even after the trial court's judgment, where the collusive aspect of the litigation simply took the form of the losing governmental parties declining to pursue appellate remedies. *See Coalition v. Annapolis Lodge,* 333 Md. 359, 368–371, 635 A.2d 412, 416–417 (1994). *See also Board of Trustees v. City of Baltimore, supra,* 317 Md. at 91–92, 562 A.2d at 729.

Judge J. Dudley Digges for this Court in *Reyes v. Prince George's County, supra,* 281 Md. at 283, 380 A.2d at 14, emphasized

"that the American system of adjudication from its inception has been grounded on the principle that adversary presentation of issues ... plays a vital and essential role in attaining justice."

Moreover, an adversary presentation is " 'a safeguard essential to the integrity of the judicial process,' " *ibid.,* quoting

---

**11.** In a letter to this Court denying that the case has become collusive, the Attorney General asserts that the State defendants, in the consent decree, did not agree that any actions by the General Assembly are unconstitutional. The decree, however, speaks for itself.

As quoted above, the consent decree recites that public school children are not being provided with an education that is adequate when measured by contemporary educational standards, and that Article VIII, § 1, of the Maryland Constitution "requires that the General Assembly provide all students ... with an education that is adequate when measured by contemporary educational standards ...." Thus, the decree plainly states that the General Assembly has not provided the type of education which the General Assembly is required to provide under the Maryland Constitution.

Moreover, if it be assumed, *arguendo,* that the circuit court had jurisdiction to render the decree, a holding of unconstitutionality would seem to be a prerequisite for the various numbered paragraphs in the decree.

*United States v. Johnson,* 319 U.S. 302, 305, 63 S.Ct. 1075, 1076, 87 L.Ed. 1413 (1943). Later in its *Reyes* opinion, 281 Md. at 299, 380 A.2d at 23, the Court reiterated

> "that it is essential to the effective functioning of the adjudicatory process that judgments, particularly those involving constitutional issues, be rendered only after the court has had the benefit of full presentation of opposing positions on the questions upon which it is to express an opinion."

The *Reyes* case involved a situation where statutes were challenged by a party whose costs and counsel fees were being paid by the government entity defending the statutes, and the Court was concerned that this degree of collusion might lead to an insufficient adversarial presentation of the issues. Consequently, the Court held that, when such situations arise in the future, the trial court should (281 Md. at 300, 380 A.2d at 24)

> "name counsel, without recommendation or suggestion by any party to the action, to present in the same manner and to the same extent as though representing a truly adverse party, a position in opposition to that taken by the party who initiated and for whose benefit the action was instituted."

The instant cases involve a much greater degree of collusion than was involved in *Reyes.* Unlike *Reyes,* in the present cases, after the partial summary judgment, there was no adversarial presentation of the constitutional issues. More importantly, the possible insufficiency of the adversarial presentation in *Reyes* related to the *attack* upon the statutes and governmental action. In the cases at bar, however, after a certain stage in the proceedings, there was no party *defending* the enactments of the Maryland General Assembly concerning the public schools. If, as held in *Reyes,* it is necessary to import counsel in order to challenge the validity of statutes, it would seem even more necessary to allow intervention by an interested and willing governmental party to defend the enactments of the General Assembly.

As Judge Marvin Smith emphasized for the Court in *State v. Burning Tree Club*, 301 Md. 9, 36, 481 A.2d 785, 799 (1984),

"[o]ne accused of crime, presumed under our system to be innocent, is entitled to an advocate of his position. A statute, with its presumption of constitutionality, has just as much right to an advocate of its validity."

In that case, this Court disallowed a declaratory judgment action by the Attorney General of Maryland challenging the validity of a state statute, even though there was another party in the case willing to defend the statute. In language which is directly applicable to the Attorney General's conduct in the present cases, we explained (*State v. Burning Tree Club, supra,* 301 Md. at 36, 481 A.2d at 798–799):

"Who has the duty of conducting the defense of a challenged statute if this duty does not rest upon the Attorney General of Maryland? It is no answer to say, as the Attorney General claimed at oral argument, that in this instance Burning Tree is prepared to spiritedly defend the statute. If we were to permit the Attorney General to maintain the present action for this reason, an anomalous result would be reached in a future proceeding, again brought to declare a statute unconstitutional, where the defendant may elect not to defend either for economic or other reasons. In that situation, the matter would go by default and the statute might well be declared unconstitutional, even though if properly defended a contrary result might have been reached.

"The fact that the Attorney General believes this or any statute to be unconstitutional does not make it such."

The "future proceeding" envisioned by the Court in the above-quoted passage came about in these cases when the Attorney General's Office acquiesced in the declaration of unconstitutionality, and there was no remaining party to defend the General Assembly's enactments. Not only did the Attorney General's Office abandon its "duty of appearing in the courts as the defender of the validity of enactments of the General Assembly" (*Burning Tree Club,* 301 Md. at 37, 481 A.2d at

799), but the Attorney General has vigorously opposed the efforts by the largest political subdivision of the State to intervene and defend the enactments of the General Assembly.

The language of a three-judge federal court in *Nash v. Blunt*, 140 F.R.D. 400, 403 (W.D.Mo.1992), *aff'd*, 507 U.S. 1015, 113 S.Ct. 1809, 123 L.Ed.2d 441 (1993), in allowing intervention on the same side as state defendants in a case with political overtones, is pertinent here:

> "In addition to being necessary as a check on the possible intrusion of partisan interests into these legal matters, the grants of intervention were necessary to insure this court's jurisdiction. In arriving at the proposed settlement, the parties necessarily agreed on a wide variety of factual and legal issues; for instance, the parties agreed that the proposed settlement does not violate the Constitution or the Voting Rights Act and that the court's adoption of the settlement was the best solution to this entire lawsuit. This court was (and, to some extent, is still) concerned that the parties might actually agree on many of the central issues involved in this case, thereby depriving the court of 'opposing parties representing adverse interests' as required by Article III. *Financial Guar. Ins. v. City of Fayetteville*, 943 F.2d 925, 929 (8th Cir.1991). By allowing the intervenors to participate in this case, we have insured that opposing viewpoints will continue to be presented to the court.[3]
>
> "[3] Even if the parties' agreement on certain issues did not implicate Article III concerns, we would still grant the motions to intervene because the intervenors' presence will aid the court in resolving the issues presented in this case."

Another federal court, after reviewing numerous cases, made a similar point (*Herdman v. Town of Angelica*, 163 F.R.D. 180, 190 (W.D.N.Y.1995)):

> "The cases cited above indicate that in considering a motion to intervene as of right on the side of a government entity in an action in which the government entity is not suing as *parens patriae*, but rather is defending the legality of its actions or the validity of its laws or regulations, courts should examine both (1) whether the government entity has

demonstrated the motivation to litigate vigorously and to present all colorable contentions, and (2) the capacity of that entity to defend its own interests and those of the prospective intervenor."

*See also Hopwood v. State of Texas,* 21 F.3d 603, 606 (5th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 2580, 135 L.Ed.2d 1094 (1996) ("The proposed intervenors have not demonstrated that the State will not strongly defend its affirmative action program").

I do not mean to suggest that, in ordinary litigation, whenever a party enters into a consent judgment, the case has become collusive and intervention by a third party is warranted. Obviously this is not so. Parties should be encouraged to resolve their differences by reaching agreements. Nevertheless, when an action is brought to declare unconstitutional the enactments of the General Assembly, when those statutes are not obviously invalid, and when at some point during the litigation there is no party defending the legislative enactments, then, under the principles set forth in the above-cited cases, the litigation has become collusive and intervention is clearly in order.

(2)

The Attorney General's position in this litigation, and the refusal by the circuit court and this Court to allow intervention for the purpose of defending the Legislature's enactments, are particularly puzzling when one considers the nature of the plaintiffs' constitutional challenge and the prior decisions of this Court. The existing "System of Free Public Schools" [12] which has been provided by the General Assembly, involving shared State and local responsibility, involving comprehensive statutory provisions relating to all aspects of education, and involving large appropriations of taxpayers' dollars, is not, as applied to "at risk" students, obviously invalid or clearly in violation of public policy embodied in constitutional provisions. If it were, perhaps a plausible argument could

---

12. Article VIII, § 1, of the Maryland Constitution.

be made to justify the position of the circuit court and the role of the Attorney General. *Cf. Simkins v. Moses H. Cone Memorial Hospital,* 323 F.2d 959, 962 (4th Cir.1963), *cert. denied,* 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964) (federal government attorneys, "unusually enough," refused to defend the validity of a racial "separate-but-equal" provision in a federal statute, although another party in the case defended the constitutionality of the provision).

Instead of the legislative enactments under Article VIII, § 1, being clearly invalid, it is the plaintiffs' constitutional theory which seems questionable in light of *Hornbeck v. Somerset Co. Bd. of Educ., supra,* 295 Md. 597, 458 A.2d 758. As discussed earlier, the plaintiffs in both cases below alleged that the "at risk" Baltimore City public school students were receiving a constitutionally inadequate education, and that this inadequacy was primarily shown by the students' scores on so-called "MSPP" and "MSPAP" tests.[13] According to the *Bradford* plaintiffs, this inadequacy primarily results from a lack of sufficient funding, "and the State's failure to assure such funding adequacy violates [its] constitutional duty." Similarly, the amended complaint in the *Baltimore City* case alleged that the "[d]efendants, in violation of the education clause [Article VIII, § 1], have failed to appropriate increases in State education funding necessary for all school districts, particularly Baltimore City, to provide all students with a basic public school education." In fact, as pointed out in Part II A of this opinion, the amended complaint in the *Baltimore City* case, read as a whole, appeared to be an attack upon the basic

---

13. As previously noted, "MSPP" stands for "Maryland School Performance Program." "MSPAP" stands for "Maryland School Performance Assessment Program."

The complaint in the *Bradford* case also alleged that the inadequacy was shown by the students' high rate of being "unlawfully absent from school," the number who do not complete high school, the number who are not qualified "for admission to the University of Maryland system," the difficulty in "attract[ing] and retain[ing] qualified teachers and professional staff," alleged insufficient "quantities of 'good quality' instructional materials and supplies," the alleged inadequate condition of the school buildings, and the alleged high "rate at which students enter, withdraw from, or transfer between schools."

system of shared State and local fiscal responsibility for the schools.

Consequently, the complaints in both cases proceeded upon the primary theory that low test scores and other alleged deficiencies in students' performance and conduct, together with the State's system of public school funding, constituted a sufficient basis for the circuit court to determine that the education provided was constitutionally inadequate in violation of Article VIII, § 1, of the Maryland Constitution, and to afford appropriate relief which was additional state funding.

This Court in *Hornbeck v. Somerset Co. Bd. of Educ., supra,* 295 Md. at 620–632, 458 A.2d at 770–777, however, reviewed the history and meaning of Article VIII, § 1, and concluded as follows (295 Md. at 632, 458 A.2d at 776):

> "The development of the statewide system under § 1 is a matter for legislative determination; at most, the legislature is commanded by § 1 to establish such a system, effective in all school districts, as will provide the State's youth with a basic public school education."

Chief Judge Murphy's opinion for the Court in *Hornbeck,* 295 Md. at 624, 458 A.2d at 772, pointed out that the framers of Article VIII, § 1, in the Constitutional Convention of 1867, rejected any constitutional requirement of a "detailed system" of public education, and decided " 'that the constitution should not be encumbered with the details'; and that the 'best plan was to leave the details . . . to the legislature.' " The *Hornbeck* opinion stated that "[t]he central theme emerging from the debates [at the 1867 Constitutional Convention] was . . . to permit the legislature to adopt any system . . . and to implement it by statute." 295 Md. at 626, 458 A.2d at 773. The history of Article VIII, § 1, set forth in *Hornbeck* is replete with the concept that "the legislature be left free to adopt the system it deemed best," that the Constitution " 'reserv[ed] to the Legislature full authority to provide for a system of education in each county and the city of Baltimore,' " that the amount of funds necessary " 'is properly confided to the Legislature,' " and that the Constitution does not prescribe a

" 'system of public schools' " which is " 'perfect[ ].' " 295 Md. at 627, 458 A.2d at 774. The Court in *Hornbeck* made it clear that Article VIII, § 1, authorized "the principle of shared responsibility between State and local governments for public school education," 295 Md. at 630, 458 A.2d at 775.

It appears somewhat difficult to reconcile the plaintiffs' theory and the circuit court's declaratory judgment with the *Hornbeck* opinion and the constitutional history therein reviewed. *Hornbeck* and the history of Article VIII, § 1, indicate that it is for the General Assembly, and not the circuit court, to determine the nature of the public school system and the method of funding. Furthermore, it seems doubtful that the framers of Article VIII, § 1, contemplated that students' scores on particular tests would be the standard for judicially measuring the General Assembly's compliance with its constitutional responsibility.

There is an additional aspect of the plaintiffs' theory which would have seemed to reinforce the view that ultimate judicial relief might be difficult to obtain and that their complaints should have been directed to the political branches of the Government. As discussed earlier, the plaintiffs complained on behalf of a "class" of "at risk" children who are disadvantaged chiefly because they "live in poverty," "live with fewer than two parents," have parents who did not graduate from high school, "live with parents who are unemployed," "are homeless," "are parents or pregnant," or live under threats of violence. The plaintiffs' argument was that such children, because of these disadvantages not caused by the school system, "require greater or different resources and services than others to receive an adequate education from the public schools." Although it is certainly desirable, from a social standpoint, for government to take steps to rectify the results of poverty, unemployment, etc., as a general rule government is not *constitutionally* responsible for deprivations not caused by government action. *See, e.g., National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 461, 102 L.Ed.2d 469, 484 (1988); *Blum v. Yaretsky,* 457 U.S. 991, 1002–1003, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534, 545 (1982);

*Rendell–Baker v. Kohn,* 457 U.S. 830, 837–840, 102 S.Ct. 2764, 2769–2771, 73 L.Ed.2d 418, 425–427 (1982); *Waters v. State,* 320 Md. 52, 57–59, 575 A.2d 1244, 1246–1247, *cert. denied,* 498 U.S. 989, 111 S.Ct. 529, 112 L.Ed.2d 539 (1990); *State v. Burning Tree Club, Inc.,* 315 Md. 254, 293–294, 554 A.2d 366, 386, *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989); *Riger v. L & B Ltd. Partnership,* 278 Md. 281, 288–289, 363 A.2d 481, 485–486 (1976).

Of course, the State's obligation under Article VIII, § 1, of the Maryland Constitution to provide a free public education, fully extends to "at risk" students, and remedial measures are obviously called for. Nevertheless, the nature of the remedial measures, the amount of funding, etc., involves a balancing of educational, political, social, and fiscal considerations which is peculiarly within the province and expertise of the political branches of government.

By pointing to apparent difficulties in the plaintiffs' legal theories and in their requests for judicial relief, I am not suggesting that their lawsuits were frivolous, or that the *Hornbeck* opinion cannot be reexamined, or that *Hornbeck* may not be distinguishable in light of evidence that might be adduced at a trial, or that the Maryland system of public school financing, with its significant reliance on local funding ability, is absolutely immune from judicial challenge. I do suggest that, in light of the apparent uphill legal battle that was facing the plaintiffs, the position of the Attorney General and the State defendants, as well as the declaratory judgment of unconstitutionality without any trial, is extremely surprising and highly unusual. A situation is presented which clearly calls for intervention by a truly adverse party.

(3)

In refusing to consider the State defendants' and Attorney General's apparent acquiescence in the plaintiffs' questionable legal position, and their consent to a declaratory judgment that Article VIII, § 1, has been violated, the majority opinion seems to hold that "subsequent events" have no relevance to the matter of intervention in these cases. The majority again

myopically views the present cases as if they constituted ordinary local lawsuits. Nevertheless, in major public interest cases involving challenges to the validity of statutes or other governmental action, this Court, in reviewing the matter of intervention, has considered "subsequent events."

Thus, in *Board of Trustees v. City of Baltimore, supra,* 317 Md. at 88–92, 562 A.2d at 727–729, the Board of Trustees of Baltimore City's employee pension systems challenged the validity of city ordinances requiring that the pension systems divest their holdings in corporations doing business in South Africa. Prior to trial, four pension fund beneficiaries moved to intervene on the side of the Board, and the Circuit Court for Baltimore City denied the motion for intervention. In holding that the circuit court erred, this Court pointed to the possibility that the Board, as a city agency, might not fully contest the position of Baltimore City. In this connection we noted the event, *subsequent* to the circuit court's denial of intervention, "that, during Baltimore's last mayoral election campaign, one of the issues between the candidates concerned the propriety of permitting the Trustees to prosecute an appeal in the present case." 317 Md. at 91, 562 A.2d at 729. Moreover, in our opinion upholding the right of the beneficiaries to intervene, we pointed to the *subsequent* possibility "that the Trustees might not ask the United States Supreme Court to review an unfavorable ruling in this Court," *ibid.* *See* the discussion in *Coalition v. Annapolis Lodge, supra,* 333 Md. at 369–371, 635 A.2d at 416–417.[14] *See also Meek v. Metropolitan Dade County, Fla.,* 985 F.2d 1471, 1478 (11th

---

14. It should be noted that, at the time the circuit court denied intervention, there were indications of the possibility that the litigation might become collusive. The State defendants, represented by the Attorney General, vigorously opposed Montgomery County's motions to intervene on the side of the State defendants and to support the validity of the General Assembly's enactments. This opposition was unusual; ordinarily parties in the position of the State defendants would have gladly welcomed the assistance of Montgomery County and the very able attorneys representing the County. Moreover, the State defendants, in responding to the motions for intervention, seem to have adopted much of the plaintiffs' theory regarding the nature of the cases.

Cir.1993); *Nash v. Blunt, supra,* 140 F.R.D. at 402–403; *Palmer v. Nelson,* 160 F.R.D. 118, 122 (D.Neb.1994) ("intervention necessarily focuses upon potential *future harm* to the non-party's interest in the subject matter of the pending litigation") (emphasis in original).

## III.

The present cases are ones in which the public interest and the integrity of the judicial process require intervention. There is no existing party either defending the constitutionality of the public school system provided by the General Assembly under Article VIII of the Maryland Constitution, or challenging the circuit court's jurisdiction to abolish a government agency and create a new one with specified organization, powers and duties, or challenging the court's decree that 250 million additional dollars be provided for the Baltimore City public school system. The position of the State defendants and the nature of the circuit court's decree are so unusual that one might reasonably wonder whether the parties and the court have incorporated a particular political agenda into the "Consent Decree," and are using the judicial process and the decree simply as leverage to attain their political goals from the General Assembly.[15] In any event, if the Circuit Court for Baltimore City is going to assume the role of a super legislature for Maryland public education, at least the largest Maryland political subdivision should be represented in that legislature.

Judge RAKER has authorized me to state that she concurs with the views expressed herein.

---

**15.** References in newspaper articles and editorials to pending proposed legislation in the General Assembly, relating to Baltimore City schools, as having the purpose "to enact the terms of a court consent decree" or being "court-approved" have become legion during the past several months. *See, e.g., The Sun,* March 27, 1997, at 12A, 22A. Furthermore, the view has apparently been expressed to the General Assembly that the language of the pending legislation cannot deviate "from the consent decree" unless the deviation is "agreed to by all parties" to this litigation. *See The Sun,* March 28, 1997, at 10B.

RODOWSKY, Judge, dissenting.

I respectfully dissent. In my view the issue of intervention is not mooted by the consent decree because the conditions to which operation of the latter is subject have not been fulfilled, to date. Further, I believe that Montgomery County, Maryland, should have been permitted to intervene for the reasons stated in Part II.A of the dissenting opinion by Judge EL-DRIDGE.